J-A15043-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: S.N.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.E.P., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 190 WDA 2022 |

Appeal from the Decree Entered January 13, 2022
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  71A-2021 O.C.

| | | |
|---|---|---|
| IN RE: H.M.Q.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.E.P., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 191 WDA 2022 |

App0eal from the Decree Entered January 13, 2022
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  72A-2021 O.C.

| | | |
|---|---|---|
| IN RE: G.E.P. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.E.P., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 192 WDA 2022 |

Appeal from the Decree Entered January 13, 2022
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  73A-2021 O.C.

J-A15043-22

BEFORE: BOWES, J., KUNSELMAN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED: August 10, 2022**

D.E.P., Jr. ("Father"), appeals from the decrees involuntarily terminating his parental rights to S.N.P., born September 2017, H.M.Q.P., born July 2018, and G.E.P., born May 2020 (collectively, "the Children"), pursuant to the Adoption Act ("the Act"), 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We affirm.

We summarize the factual and procedural history of this appeal as follows. Jefferson County Children & Youth Services ("CYS" or "the Agency") had been involved with the family on two prior occasions due to the failure of Father and B.N.P. ("Mother") (collectively, "parents") to adequately care for the Children.[1] CYS provided services for a total of approximately a year and one half. **See** N.T., 12/21/21, at 64, 74-75, 94. The Children had, and continue to have, issues with walking[2] and talking, and they require services and treatment including speech therapy, special instruction therapy, occupational therapy, and physical therapy. **See id**. at 14, 18, 64, 69. CYS had provided services to the family because parents had not followed up on Children's needs, and there were domestic violence issues between the parents. **See id**. at 96-97.

_____

[1] Mother voluntarily relinquished her parental rights to the Children. **See** N.T., 12/21/21, at 5-9. Mother has not participated in this appeal.

[2] S.N.P. has issues with her leg, potentially as a result of a stroke as a baby. **See id**. at 69-70, and G.E.P. has scissoring of the legs. **See id**. at 72. G.E.P. also suffers from torticollis in the neck. **See id**.

- 2 -

The Children's current placement resulted from an incident on July 24, 2020, which the trial court aptly described as follows:

S.N.P. was then a few months shy of her third birthday, H.M.Q.P. had turned two just three days earlier, and G.E.P. was only two-and-a-half months old. . . . What [CYS intake caseworker] Lynn Hockenberry ("[Ms.] Hockenberry") observed when she arrived to deliver diapers that day, however, led her and her superiors to conclude that the [C]hildren were no longer safe in their parents' care.

[Ms.] Hockenberry waited at the door for no less than five minutes before Mother . . . responded to her knocking. [Mother] had been asleep on the couch for the previous four hours, while Father was sleeping in the bedroom, where G.E.P. sat unsecured in his baby swing. The girls, Mother said, were "down the hall."

[Ms.] Hockenberry found the girls naked, locked behind a baby gate with nothing to eat or drink and no fan or ventilation to provide relief from the sweltering heat. Visible around them were puddles of urine which, combined with the dirty diapers lying around the house, created a pervasive stench. Contributing to the overall odor were the discarded cigarette butts, moldy food, and empty beer cans littering the floor and other surfaces throughout the house. Perhaps more disturbing, though, were the butcher knives lying well within the girls' reach had they escaped their home-prison and made their way to the kitchen. Those conditions, the Agency concluded, amounted to a lack of parental care and control and egregious neglect. The [c]ourt agreed, finding that the situation warranted an emergency order for custody the day of [Ms.] Hockenberry's visit . . ..

Trial Court Opinion, 1/12/22, at 1-2; **see also** N.T., 12/21/21, at 11-12, 93-98. On July 29, 2020, the court adjudicated the Children dependent due to a "lack of parental care and control and egregious neglect over a period of time." N.T., 12/21/21, at 11, 97.

Thereafter, the court conducted regular review hearings. **See** N.T., 12/21/21, at 12-13. Father's family service plan goals included: (1) meeting

- 3 -

the Children's medical needs; (2) stabilizing his mental health concerns; (3) maintaining cooperation with CYS; (4) improving childcare knowledge and skills; (5) obtaining and maintaining stable employment; (6) maintaining recovery from drug and alcohol abuse; (7) maintaining stable and appropriate housing; and (8) providing appropriate and adequate supervision of the Children. *See id*. at 13-16. Father was initially "moderately compliant." *Id*. at 13. He completed a nurturing parenting program, a drug and alcohol evaluation, anger management, and a mental health evaluation. *See id*. at 14-17. Father did not obtain employment, but he was on disability for a condition that prevented him from working.[3] *See id*. at 15, 65.

Father, however, canceled visitation "from time to time" and refused "a few" random drug tests. *Id*. at 13. Additionally, during one visitation with the Children at JusticeWorks Youth Care on October 27, 2020, Father engaged in "an incident of violence," when he got into a fight with Mother during a visit, threw a bag near one of the Children, and punched out a window of a nearby garage, which resulted in the police being called. *Id*. at 17, 36-39. Father reportedly kissed the Children goodbye, told them he was going to kill himself, and banged his head on a door. *See id*. at 38-39.

On April 19, 2021, Father was incarcerated on charges of endangering the welfare of children related to the neglect of the Children's medical needs. He was sentenced to fifteen months to five years of imprisonment. *See id*.

---

[3] Father's disability related to scoliosis, which did not prevent him from caring for the Children. *See id*. at 65.

at 29, 49, 51. His last visit with the Children was a video visit on May 3, 2021, while he was still incarcerated at the Jefferson County jail, prior to his transfer to state custody. *See id*. at 18, 21, 29-30, 41. Following this visit with the Children, Father failed to maintain contact with CYS. *See id*. at 14.

On November 19, 2021, CYS filed petitions for the termination of Father's parental rights. By that time, Father had not completed all of his goals concerning the stabilization of his mental health, including undergoing domestic violence counseling, a psychological evaluation, and marital counseling. *See id*. at 14, 17. Father had not been able to maintain stable housing, maintain cooperation with CYS, or meet the Children's medical needs. *See id*. at 13-14, 16-17.

The trial court held a hearing on December 21, 2021. Father, who was incarcerated at SCI-Rockview, was present and represented by counsel. The Children were represented by a guardian *ad litem* ("GAL") and separate legal counsel.[4] CYS presented the testimony of CYS caseworker Alyssa Snyder ("Ms. Snyder"), and JusticeWorks Youth Care supervisor Sierra Barber ("Ms. Barber"). Father presented the testimony of his sister C.C., and he also

---

[4] The trial court appointed Danielle Melillo, Esquire, as counsel for the Children, and Kerith Strano Taylor, Esquire, as GAL. At the conclusion of the hearing, both legal counsel and the GAL argued in support of termination of Father's parental rights. N.T., 12/21/21, at 102-03. Further, they have submitted a joint brief with CYS to this Court in favor of termination.

testified on his own behalf. The GAL presented the testimony of Ms. Hockenberry, the CYS intake caseworker.

By separate orders, the trial court terminated Father's parental rights to each of the Children. Father filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[5]

On appeal, Father raises the following issues for our review:

1. Whether the lower court erred in terminating Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1).

2. Whether the lower court erred in terminating [Father's] parental rights under 23 Pa.C.S.A. § 2511(a)(2).

3. Whether the lower court erred in terminating [Father's] parental rights under 23 Pa.C.S.A. § 2511(a)(5).

4. Whether the lower court erred in terminating [Father's] parental rights under 23 Pa.C.S.A. § 2511(a)(8).

Father's Brief at 4 (renumbered).

Our review in a termination of parental rights case is limited to determining whether the trial court's decision is supported by competent evidence. **See In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021) (citation omitted). Appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. **See**

---

[5] On February 10, 2022, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a), in which it references the notes of testimony and its opinion issued contemporaneously with the decrees. This Court *sua sponte* consolidated Father's appeals on March 4, 2022.

*Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (citation omitted). An appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *See id*.

Termination of parental rights is governed by 23 Pa.C.S.A. § 2511. If the trial court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, then the court must assess the petition under section 2511(b), which focuses on the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[6] Where, as

---

[6] Father has not stated an issue or developed a challenge related to the trial court's determinations under section 2511(b). Panels of this Court have sometimes relied on *In re C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*), to address section 2511(b) *sua sponte*, even where the appellant has made no effort to present a challenge regarding that section. In *In re M.Z.T.M.W.*, 163 A.3d 462, 466 n.3 (Pa. Super. 2017), a panel of this Court concluded that *C.L.G.* does not require consideration of section 2511(b) in every appeal from a decree involuntarily terminating parental rights. *Id*. (concluding that because mother failed to include a challenge to section 2511(b) in her concise statement and statement of question involved, any challenge to that subsection was waived). Here, as Father failed to preserve any challenge to section 2511(b), we will not address it. In any event, we note that his passing reference to a bond with the Children because they were

here, the trial court determines that there are grounds for termination under more than one subsection of section 2511(a), we need only agree with the trial court's determination as to any one subsection in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004). Given this latitude, we analyze the court's termination decrees pursuant to subsection (a)(2), which provides as follows:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

Regarding termination of parental rights pursuant to section 2511(a)(2), we have indicated:

> [T]he following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

---

"clamoring for his attention during visits prior to incarceration," Father's Brief at 9, lacks any support in the record and fails to establish an abuse of discretion in the trial court's determination that the Children's needs and welfare are best served by terminating his parental rights. *See* Trial Court Opinion, 1/12/22, at 8.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017). As such, a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *See S.C.*, 247 A.3d at 1105.

Further, our Supreme Court has held that a parent's incarceration is a factor, and indeed can be a determinative factor. A court may find that grounds for termination exist under section 2511(a)(2), where the parent's repeated and continued incapacity due to incarceration has caused a child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied. *See In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012).

On appeal, Father "adamantly disputes that said incapacity cannot or will not be remedied." Father's Brief at 13. Father highlights his planned return to his sister's home upon release from incarceration and his commitment to the Children's treatment. He states that he "laid out his plan for adequate housing with his sister[, and that she] confirmed the same.

Although continued treatment and appointments will remain a constant and important part of this family's existence, [Father] is able and committed to making that happen. . . ." ***Id***. (citations to record omitted). He further emphasizes the rapid improvement of the home conditions observed at the time of removal. **See** *id*.

The trial court, when terminating Father's parental rights, found:

Father's dereliction goes well beyond a lack of contact and the attendant failure to perform parental duties . . .. The [C]hildren were removed from his care because of severe neglect. Eighteen months' worth of family services was insufficient to prevent it, and nine additional months of services after the [C]hildren were removed[,] and while Father was still a free man[,] did not rectify the underlying issues. Father was the reason, because he lacked the resolve to complete or even [make] a concerted effort toward completing most of the [family service plan] goals identified for him as prerequisite to reunification. Domestic violence counselling, he decided, was [un]necessary[,] since he and Mother were no longer a couple, while securing a psychological evaluation and obtaining stable housing, it seems, required more of a commitment than he was willing to make.

Father affirms that he will be able to complete his [family service plan] goals once he is paroled, but the [c]ourt is far less confident. His current "stable housing" plan, his sister made clear, is in fact only temporary, and his persistent refusal to push back against even the smallest amount of resistance, e.g., refusing to reach out to prison staff to make sure he could see [the Children] and making no further attempts to contact CYS after [Ms.] Snyder did not answer any of the three calls he placed the same day, argues against the idea that he will do post-parole what he failed to do in the first nine months of [the Children's] dependency— before he was incarcerated. Compounding the problem is Father's profound lack of insight about [the Children's] needs and the demands they would make on him as a single parent. Even now, after having had the benefit of extended services in his own home, and after [the Children] have received . . . additional months of intensive services in foster care, Father is mostly ignorant of both the conditions necessitating therapy and the therapeutic methods

- 10 -

being employed. By implication, therefore, he lacks a useful understanding about their needs going forward and what meeting those needs would demand of him. That being the case, it seems highly unlikely that whatever services will be available to him post-parole will allow him to rectify his parental deficiencies and reunite with his children within a reasonable period of time. It is axiomatic, after all, that one has to recognize a problem before he can fix it, and thus far, Father has not taken that first step.

Trial Court Opinion, 1/12/22, at 7.

Our review of the record supports the trial court's finding of grounds for termination under section 2511(a)(2). As noted above, Father was incarcerated beginning April 19, 2021, on charges of endangering the welfare of children related to his care of the Children. *See* N.T., 12/21/21, at 16, 29, 49, 51. Father conceded that his incarceration resulted from his medical neglect, which resulted in the Children's dependency. *See id*. at 51, 73. As a result, Father was serving a sentence of fifteen months to five years of imprisonment. *See id*. at 49, 51. Father testified that he expected to be paroled and released on March 27, 2022, but he admitted that his release was contingent upon his behavior. *See id*. Based on this record, the trial court did not abuse its discretion when finding that Father's repeated and continued incapacity and neglect caused the Children to be without essential parental care necessary for their physical and mental well-being. *See* 23 Pa.C.S.A. § 2511(a)(2); *see also L.A.K.*, 265 A.3d at 591.

Moreover, the record shows that Father was unable to complete his family service plan goals. While acknowledging that Father completed a drug and alcohol evaluation without a further assessment being directed, Ms.

- 11 -

Snyder, the CYS caseworker, also reported her continuing drug and alcohol and mental health concerns. *See* N.T., 12/21/21, at 14-16. Ms. Snyder noted that Father had tested positive for drugs despite undergoing an evaluation, and refused a drug test before being arrested. Father also did not complete a psychological evaluation, domestic violence counseling, or marital counseling.[7] *See id*. at 14.

While Father further testified that he was approved to be released to his sister's house and that this was a "long-term" housing plan, *see id*. at 50-51, 59, the record supports the trial court's decision to reject this testimony. *See* Trial Court Opinion, 1/12/22, at 7. Ms. Snyder did not believe this was Father's intention, was not aware that this was Father's home plan upon release, and noted that there was not enough space for the Children at Father's sister's home. *See id*. at 25. Father's sister also contradicted Father's claim that this was a long-term plan. *See id*. at 84. To the contrary, she explained that she was helping Father get up on his feet, but he would need to get his own place and get settled. *See id*.

---

[7] Father explained that he told the drug and alcohol evaluator he took non-prescribed drugs, but that he was not recommended for a further assessment because he took them for back pain. Father also stated that no one in the area did psychological evaluations, but that he was seeing a therapist whom he was going to continue seeing upon release. According to Father, he was told that he did not have to engage in domestic violence counseling if he separated from Mother, and he was no longer with Mother. *See* N.T., 12/21/21, at 61, 74, 79-80. However, the trial court rejected Father's testimony, as was within its province. *See* Trial Court Opinion, 1/12/22, at 2 n.3; *see also S.K.L.R.*, 256 A.3d at 1123-24.

Critically, the record supports the trial court's finding that that Father failed to demonstrate any resolve in overcoming obstacles to parenting the Children. *See* Trial Court Opinion, 1/12/22, at 7. Ms. Snyder explained that Father had no unsupervised visitation with the Children since removal. *See* N.T., 12/21/21, at 16. His last visitation with the Children was a video visit on May 3, 2021, when he was at the Jefferson County jail prior to his transfer to state custody.[8] *See id*. at 18, 21, 29-30, 41. Thereafter, Father wrote three letters and tried to call the Agency three times on one day to request contact with the Children. Ms. Snyder, recognizing the communication difficulties as a result of Father's incarceration, wrote back to him requesting that he speak with his prison counselor or social worker because she could not arrange visitation from outside the Department of Corrections without his approval and his follow up to obtain permission for visitations.[9] Father admitted that he failed to contact anyone within the Department of Corrections about visitation with the Children, and he did not submit a request slip to speak with his prison counselor about visitation, despite doing so for other

---

[8] Father testified to telephone contact with the Children during their visitation with Mother in the fall of 2021. *See* N.T., 12/21/21, at 66-68, 77-78, 80-81. Ms. Barber, the supervisor at JusticeWorks Youth Care, stated that there was no notation that such contact occurred. Further, such contact was not authorized by CYS and would normally require CYS approval. *See id*. at 101.

[9] Ms. Snyder detailed unsuccessful attempts to register herself and the Children at the prison due to Father's inaction. *Id*. at 30-31.

issues.  *See id*. at 21-22, 30-32, 57-59.  Ms. Snyder also offered Father a final visit which never took place.  *See id*. at 21.

Lastly, the record supports the trial court's finding that Father lacks an understanding of the Children's special needs requiring services and treatment.  *See* Trial Court Opinion, 1/12/22, at 7.  As Ms. Snyder testified, G.E.P. receives Early Intervention services which help with his walking and talking; H.M.Q.P. and S.N.P. both attend an intermediate unit school, and they both receive speech therapy.  *See* N.T., 12/21/21, at 18.  Additionally, H.M.Q.P. receives special instruction therapy, and S.N.P. receives occupational therapy and physical therapy as well as Early Intervention.  *See id*. at 18.[10]  Father did not attend or participate in any of the occupational, speech or physical therapy sessions for the Children, even before his incarceration.  *See id*. at 18, 33-35.  Further, at the termination hearing, Father admitted to failing to obtain treatment, which the Children have subsequently received since placement, and he was unable to describe any details of the Children's special needs or the therapy and treatment they receive.  *See id*. at 69-73.

Based on the foregoing, we discern no abuse of discretion by the trial court in concluding that causes of Father's incapacity and neglect could not be remedied.  *See* 23 Pa.C.S.A. § 2511(a)(2); *M.A.B.*, 166 A.3d at 443-46; *see*

---

[10] S.N.P. was seen at Children's Hospital for issues with her legs and walking and required therapy.  *See* N.T., 12/21/21, at 14, 64, 69.

*also L.A.K.*, 265 A.3d at 600-01. The court had ample basis to consider Father's lack of diligence and his lack of insight into the needs of the Children when rejecting his assertions that he would be in a position to care for the Children following his release from prison. *See S.C.*, 247 A.3d at 1105 (citation omitted) (reiterating that the court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the agency or take advantage of available services during the dependency proceedings). As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006); *accord In re E.A.P.*, 944 A.2d 79, 83 (Pa. Super. 2008). Thus, Father's issue on appeal lacks merit, and we affirm the court's decision to terminate Father's parental rights pursuant to section 2511(a)(2).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

- 15 -

J-A15043-22

Date:  8/10/2022